```
                                                              1

 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3    ----------------------------)
      UNITED STATES OF AMERICA,   )   Case No.
 4                                )   11-60228-CR-HURLEY
                                  )
 5        - versus -              )
                                  )
 6    DEYVI ORANGEL PENA ARTEAGA, )   West Palm Beach, Florida
        A/K/A  JOSE LUIS ALVAREZ  )   May 29, 2012
 7                                )
                 Defendant        )
 8    ----------------------------)

 9

10                    SENTENCING TRANSCRIPT
             BEFORE THE HONORABLE DANIEL T.K. HURLEY
11                 U.S. DISTRICT COURT JUDGE

12
      A P P E A R A N C E S:
13

14    For the Government:       BERTHA R. MITRANI, ESQ.
                                Assistant U.S. Attorneys
                                500 South Australian Avenue
15                              West Palm Beach, Florida  33401

16    For the Defendant:        SUSAN DMITROVSKY, ESQ.

17

18

19

20
      Reporter:                 Richard W. Barry, RPR
21                              Official Court Reporter
                                (516)317-5133
22

23

24

25
```

```
                 - S E N T E N C E -                    2
```

 1          THE COURT:  Good morning everybody, please be

 2   seated.

 3          The first matter before the Court this morning is

 4   case number 11-0228, and this is the case of the United States

 5   of America versus Mr. Jose Luis Alvarez.

 6          Let me begin if I might by allowing the lawyers to

 7   make their appearances, and I am going to start by recognizing

 8   counsel for the Government.

 9          MS. MITRANI:  Good morning Your Honor, Bertha

10   Mitrani on behalf of the United States.

11          THE COURT:  And let me turn now if I might to the

12   counsel for the defense.

13          MS. DMITROVSKY:  Morning Your Honor, Sue Dmitrovsky,

14   on behalf of Jose Alvarez.

15          THE COURT:  Ms. Dmitrovsky and Mr. Alvarez, good

16   morning, sir.

17          As the parties will recall, when Mr. Alvarez was

18   last before the Court, it has been awhile now, that was back

19   in March.  That was when Mr. Alvarez came and announced his

20   decision to change his plea, from a plea of not guilty to a

21   plea of guilty.

22          As a result of that, of course, the probation office

23   was asked to prepare a presentence investigation report.  That

24   report has been completed and a copy has been provided to each

25   party.

```
                        - S E N T E N C E -                        3
```

1        Today, the process for determining what would be an

2    appropriate sentence is really a two step process, because the

3    United States Supreme Court has instructed that the first step

4    must be for the Court to consult what are called the advisory

5    sentencing guidelines.  To do that, and I must tell you that

6    our Court of Appeals has repeatedly told us that in order to

7    properly consult the guidelines, we need to make sure that

8    they have been correctly calculated.

9        And the way to do that is to stop for a moment or

10   two and go back and take a second look at the presentence

11   investigation report.

12       First and foremost we want to be sure that the

13   factual statements that are laid out in the report that they

14   are accurate.  And then second, we need to be sure that

15   whatever legal conclusions have been drawn from those facts,

16   that they are appropriate and justified.

17       Then of course finally but very important, we want

18   to make sure that the numbers, the calculations that have been

19   generated that they too are accurate.

20       Now, I know that it is normal and par for the

21   course, that when a presentence investigation report is

22   prepared, there are often discussions between the lawyers,

23   sometimes with the probation officer.

24       So, I'm going to take the position today, that

25   unless something is brought to my attention, I will assume

- S E N T E N C E -                           4

1   that anything else that may have been raised earlier, has been

2   resolved and is no longer at issue.

3            So, with that as a background, let me turn to Ms.

4   Dmitrovsky, to see if there are any remaining factual issues

5   that we need to discuss this morning.

6            MS. DMITROVSKY:  Your Honor, the only thing that I

7   want to correct is paragraph 35 under the mental and emotional

8   state.  Where it says that Mr. Pena began when he returned

9   from Canada, to Venezuela as a 19-year old art student.

10           THE COURT:  Just, let me stop you and see if I can

11   catch up with you for a moment.

12           MS. DMITROVSKY:  The second sentence.

13           THE COURT:  The second sentence.

14           MS. DMITROVSKY:  It should be 19 years old.  The art

15   student.  He was abused by the police officer.

16           THE COURT:  I see it says 13-year old.  You say the

17   13 should be changed to 19.

18           MS. DMITROVSKY:  Yes, it makes a difference.

19           THE COURT:  Any objection to making that correction?

20           MS. MITRANI:  No, Your Honor.

21           THE COURT:  We will make that correction.

22           MS. DMITROVSKY:  Other than that, Your Honor, I

23   don't have any other changes.

24           THE COURT:  Thank you so much.

25           Let me turn to Ms. Mitrani from the Government's

- S E N T E N C E -                                    5

1   point of view, are there any factual matters that we need to

2   discuss?

3           MS. MITRANI:  No, Your Honor.

4           THE COURT:  Why don't we move then into that second

5   category of legal issues and again, let me turn back to Ms.

6   Dmitrovsky, are there any legal issues within the guidelines

7   that need to be discussed?

8           MS. DMITROVSKY:  Your Honor, I would like to raise

9   as I did in the sentencing memorandum, the 5H1.1.

10          THE COURT:  Sure, I will make a note of that.

11          Anything else other than that?

12          MS. DMITROVSKY:  Standpoint of legal issues, do you

13  want if 35--

14          THE COURT:  No, I'm only looking now within the

15  guidelines.

16          MS. DMITROVSKY:  Then I have nothing else other than

17  the guidelines.

18          THE COURT:  Let me turn if I might to Ms. Mitrani,

19  does the Government have any legal issues within the

20  guidelines that need to be discussed.

21          MS. MITRANI:  No, sir.

22          THE COURT:  Thank you very much.

23          One of the reasons for-- let me backup for a second

24  so that everybody understand this.

25          The guidelines represent an effort to try to make

- S E N T E N C E -                      6

1   the entire sentencing process more fair.  Before we had the

2   guidelines, studies were done, and it appeared that people who

3   had pretty much the same background and committed the same

4   crime that there were very different sentences that were being

5   imposed.  It was hard to understand why that was happening.

6   Sometimes it was urban versus rural, sometimes the part of the

7   country and so on.

8           So Congress felt that as a starting point there

9   really ought to be more uniformity and so, that is why the

10  guidelines are important and represent if you will, the

11  beginning step.

12          Now, one of the reasons we, if you will, separated

13  first when looking at the factual content of the report from

14  the legal issues, is that the rules are slightly different.

15  When we are talking about facts, if there is an objection, the

16  Government always bears the burden of establishing the

17  controverted fact by a preponderance of the evidence.

18          In the legal area, the rules are slightly different

19  and I think the rule is this, if we are dealing with something

20  which if established would raise the sentence, the Government

21  bears the burden of persuasion.

22          If we are dealing with something which if

23  established would have an impact of lowering the sentence, the

24  defendant bears the burden of persuasion.

25          I take it, this is a question of cultural

- S E N T E N C E -                          7

1   assimilation that is being raised?

2            MS. DMITROVSKY:  Actually, I misquoted the 5H1.6, we

3   are discussing is his family responsibility.

4            THE COURT:  Okay.

5            MS. DMITROVSKY:  To his partner James.

6            THE COURT:  That is something which if established

7   would have an impact of lowering the sentence.

8            MS. DMITROVSKY:  If need be.

9            THE COURT:  So, do you agree then that the defendant

10  bears the burden of persuasion on that point?

11           MS. DMITROVSKY:  Yes, Judge.

12           THE COURT:  Well, fine.

13           Does the defense want to offer evidence on this

14  point?  In other words, in resolving these issues, I think the

15  Court is free to look at, all of the un-objected to facts, in

16  the presentence investigation.

17           So what I am really asking you is, do you want to

18  put on additional evidence over and above what is already set

19  out in the presentence investigation report?

20           MS. DMITROVSKY:  I don't think that we need to,

21  Judge.

22           THE COURT:  All right.

23           MS. DMITROVSKY:  I think that adequately describes

24  it.

25           THE COURT:  And let me turn to the Government, does

- S E N T E N C E -                          8

1    the Government want to put on evidence on this point?

2              MS. MITRANI:  No, sir.

3              THE COURT:  So the evidence is closed and it consist

4    of all of the un-objected to facts in the presentence

5    investigation report.

6              Well, then let me turn back to Ms. Dmitrovsky for

7    argument and ask her if she would be good enough to come up to

8    the lectern.

9              MS. DMITROVSKY:  I assume, Judge that I'm giving

10   argument on my entire --

11             THE COURT:  No, just so I want to try to be careful

12   because I think we all want to keep in mind that we want to

13   make sure that there is a record that utilized, capable of

14   being used by both sides, that would be of assistance to the

15   appellate court if they need it.  If we can keep the argument

16   as focused as possible.

17             I am simply looking for argument you wanted to offer

18   in favor of the reduction or variance on this.

19             MS. DMITROVSKY:  I will tell you--

20             THE COURT:  Actually, I guess a departure if we are

21   right.

22             MS. DMITROVSKY:  If it would be a departure.  I will

23   speak to the variance later.

24             Judge, Mr. Randi, who has been a partner to my

25   client, who I still call Jose, I will try to say Davyi Pena,

- S E N T E N C E -                    9

1    they have been together 25 years.

2           During that time and in the binder I have provided

3    you, and to the Government, it is quite clear that Mr. Randi,

4    as he has aged, has had a number of serious health problems

5    including intestinal cancer, I believe a bypass surgery, a

6    stroke, which he had to spend a lot of time in the hospital

7    for.

8           Mr. Alvarez was at his side during that time.  That

9    is the most important thing to know about that.  And during

10   these recoveries, still had a shunt in, in case he needs more

11   chemotherapy or radiation.

12          But essentially, Judge, as Mr. Randi had grown

13   older, he has come to rely more and more on Mr. Alvarez for

14   they live together, for his daily care.

15          And although he has been able to travel as I said in

16   my motion to briefly continue the case, it has become more and

17   more difficult because Mr. Alvarez is on home confinement.

18          So, a lot of the details for Mr. Randi's traveling

19   has had to be taken over by Rick Adams and others, who is his

20   power of attorney as well.

21          So --

22          THE COURT:  Mr. Adams holds the power or Mr.

23   Alvarez?

24          MS. DMITROVSKY:  Rick Adams, he wrote a letter to

25   you.

- S E N T E N C E -                    10

1    THE COURT:  I have that.

2    MS. DMITROVSKY:  And, so, it would be very difficult

3  for Mr. Randi at his age to continue, and we really, frankly,

4  I mean I think he is going to live forever but he is pretty

5  spunky, but it would be very difficult and it has been

6  difficult for him to adjust to life without Jose during the

7  two months he was incarcerated, and also even to get around

8  and do things with Jose having to stay at the house.

9         So, with that, I would ask-- I have Mr.--

10   THE COURT:  Could you help me out a little bit more

11 in terms of Mr. Randi's financial situation.  I took it that

12 he is man of some means, am I wrong in that regard?

13   MS. DMITROVSKY:  He has been a man of some means and

14 he will discuss that with you.  But the philosophy of Mr.

15 Randi and Mr. Pena, is that they are very -- I can't think of

16 the word.  I must have hit my head hard.

17   THE COURT:  I think I was asking you, if Mr. Randi

18 needed to obtain the assistance of others, would we have the

19 financial wherewithal to do that.

20   MS. DMITROVSKY:  He does not really have that.  That

21 is one reasons why he was in Europe is to earn money.  One

22 because of the situation of this case, since they have always

23 shared their funds together.

24         He has relied on friends to pay a fee for this case

25 and he continues to work really to keep up with what they need

- S E N T E N C E -                    11

1    to do with this and the immigration.

2          THE COURT:  The "he" now is Mr. Randi or Mr.

3    Alvarez?

4          MS. DMITROVSKY:  Mr. Randi and Mr. Alvarez.  But Mr.

5    Randi has gone to his sources for loans to pay for this case

6    and others that are coming with immigration.

7          Also, I will say that they were hurt by the

8    hurricane, I don't know which hurricane was it David?

9          By Wilma, their home was destroyed in Plantation and

10   they were-- had $230,000 stolen from them by a contractor.

11         So, they are in debt to Mr. Adams for that money for

12   having their house renovated. In addition to whatever medical

13   costs he has had.

14         So, he is not a wealthy man.  He is a very generous

15   man, to his family and friends as is Davyi Pena.

16         I'm sure that had he saved more as he had gone along

17   in his career he would be sitting better financially.  He is

18   not destitute of course, but to have his partner who lives

19   with him, be able to take care of getting him to doctors and

20   things like that.

21         In fact, it is one of the reasons that Ms. Mitrani

22   generously allowed Davyi Pena out on bond, because they knew

23   that Mr. Randi really relied on his care.  24/7.  I mean they

24   live together, I have been to their house.

25         So, I would say given that, it would be very hard

- S E N T E N C E -                    12

1   for Mr. Randi, and he has adjusted, because he viewed Mr.

2   Pena's assistance, his assistance to help him get around and

3   Mr. Adams for some of the flights and things he has had to

4   take, which has been really gruelling for a man of his years.

5         THE COURT:  Mr. Randi today is in his early 80's is

6   he?

7         MS. DMITROVSKY:  He is, he is here today.

8         And, not in exactly -- he is in fairly good health.

9   Needless to say, he did need a power of attorney and that is

10   why he asked Mr. Adams to do that for him.

11         So I would say, Judge, if you were thinking of a

12   sentence of incarceration, it would be very hard pressed to

13   adjust to that.

14         Since they had -- Mr. Alvarez, I mean I saw it

15   during the two months he was in prison before we got bond when

16   he was in jail.

17         And, also, emotionally, and I think that we are

18   going to have some people speak to that.  Mr. Ver Ploeg who

19   knows them very closely.

20         Emotionally would be very difficult for Mr. Randi.

21   This whole ordeal has been difficult for him.  I have seen him

22   throughout it and I think he would be-- it is very easy for me

23   to say that it could effect him enough emotionally that it

24   could cause his demise.  I mean he was really depressed during

25   this period of time.

- S E N T E N C E -                    13

1      So, with the guidelines that we have been given--

2  no, I would ask for a departure to allow Mr. Alvarez to stay

3  at home with Mr. Randi and to take care of him.  He has been

4  doing for years.

5      I really don't have anything else to say.

6      THE COURT:  Thank you very much.

7      Let me turn to Ms. Mitrani if I might and invite her

8  to come up to the lectern and give me the benefit of the

9  Government's thinking on this point.

10      MS. MITRANI:  Morning, Your Honor.

11      THE COURT:  Good morning.

12      MS. MITRANI:  You know, I realize the Court wants to

13  keep this narrowly tailored so I anticipate being up again.

14      I will say that just speaking strictly on the

15  departure point, the Government opposes it.  I don't want to

16  minimize at all the health issues that Mr. Randi has.  I

17  realize it is somebody who is fortunate enough to live as long

18  as he has lived, is going to have those health issues.  So I

19  completely understand that and I don't in a sense contest

20  that.

21      Nor do I contest the fact that he might need,

22  probably I'm sure he needs assistance, people usually that age

23  do.  I have elderly parents myself and I don't doubt that Mr.

24  Alvarez has been providing that.  So I really want to say

25  that, to make it clear that-- to that end, I don't dispute

- S E N T E N C E -                  14

1   that factually.

2           What I will say and as the Court is well aware, so I

3   wouldn't belabor the point, the defendants who come before the

4   Court almost always have a family that is going to be impacted

5   negatively and defendants who come before this Court, and all

6   courts, quite often have young children, minors, who depend on

7   them, who would be adversely effected if somebody were to

8   serve a term of imprisonment and people have parents often

9   times who would be adverse.

10          So what I am saying Your Honor is that Mr. Alvarez

11  and I call him Alvarez as well, since I am used to it, I

12  realize that is not his legal name.  He is not so different

13  than the myriad of defendants that come before the Court to

14  warrant the departure.

15          On strictly a departure grounds, the Government

16  would oppose.  I will just preview that the guidelines would

17  call for a sentence that would allow Mr. Alvarez to continue

18  on home arrest and continue to care for Mr. Randi so in that

19  regard, the Government is going to take that into

20  consideration later on when it makes its recommendation,

21  ultimately of time served plus continued house arrest.  So

22  perhaps that can be addressed that way.

23          But strictly as a departure outside of the

24  guidelines case, I don't feel that that is the case here

25  because unfortunately, other defendants have people on whom

- S E N T E N C E -                    15

1   they depend and that is going to adversely effect them.

2           THE COURT:  Thank you very much.

3           Anything else at this point Ms. Dmitrovsky?

4           MS. DMITROVSKY:  No, Your Honor.

5           THE COURT:  I mentioned earlier the guidelines

6   represent an effort to try to analyze and factor in different

7   circumstances that either should or should not be taken into

8   consideration in determining what is an appropriate sentence.

9           And, there is a provision in the guidelines that the

10  lawyers have been referring to, called section 5H1.6.  It says

11  that in sentencing a defendant convicted of an offense, other

12  than offenses described below, family ties and

13  responsibilities are not ordinarily relevant in determining

14  whether a departure maybe warranted.

15          Now, there are cases that have come before the

16  Courts and just to review a couple of them, because I think

17  they give you a sense.  Remember there was a time when the

18  guidelines were mandatory, that is not advisory and where the

19  general rule was, that the Court was obligated to impose a

20  sentence within the guidelines range unless there was some

21  extraordinary reason.

22          In 2003, there was a case before the 10th Circuit

23  Court of Appeals, called United States versus McClatchey at

24  316 F 3rd, page 1122.

25          In that case, the defendant's 22-year old son had

- S E N T E N C E -                          16

1   been diagnosed with attention deficit and hyperactivity

2   disorder as in a severe category and in that case, the Court

3   reviewed the guidelines and said that family circumstances are

4   a permissible but nonetheless discouraged ground for departure

5   under the guidelines.

6           A District Court may depart based on a factor that

7   is permissible but discouraged only if the factor is present

8   to an exceptional degree or in some other way makes the case

9   different from the ordinary case, where the factor is present.

10          In other words, the Court can depart, but it has to

11  be in a very extraordinary circumstance.

12          And the Court went on to say that in this case, the

13  son's need for management, structure and support, in his daily

14  routine did not justify the downward departure.

15          Another case came from the United States Court of

16  Appeals for the 11th Circuit, which is of course the Appellate

17  Circuit that this Court is bound to follow.  It was called

18  United States versus Allen.  The case is reported at 87 F 3rd,

19  page 1224.

20          In that case, the defendant moved for a downward

21  departure under this section on the basis that she was the

22  primary caretaker of her 70-year old father, who was suffering

23  from Alzheimer and Parkinson's disease.

24          I think the Appellate Court's opinion in my mind

25  exemplified how difficult this is -- an area is, because the

- S E N T E N C E -                    17

1   Court said, in its view, the Allen family-- the defendant's

2   family responsibilities, though difficult, were not

3   extraordinary.  The Court said we conclude that the defendant

4   had shown nothing more than that which enumerable defendants

5   could no doubt establish, namely the imposition of prison

6   sentences, normally disrupt family relationships.

7          I think anyone who has ever been close to someone

8   who is suffering from Alzheimer let alone Parkinson

9   understands the extraordinary burden that is placed upon the

10  caretaker and so, in my mind that case really showed how

11  extraordinary the situation would have to be.

12         Candidly, I'm not sure I agree with that opinion,

13  that is neither here nor there.

14         The point is, under the guidelines, family

15  responsibilities or things of that nature really do have to be

16  just very very extreme.

17         One of the things that has come home to me, in my

18  time on the bench is that usually no one is alone at the time

19  of sentencing, and while the defendant bears obviously the

20  burden, the primary burden of whatever the sentence is imposed

21  it is very very clear that there are others, family members,

22  partners, people who share in that burden.

23         Just two weeks ago in a very serious case, the

24  defendant's sister stood up and gave a very eloquent statement

25  and of course, standing beside her, sitting beside her was the

- S E N T E N C E -                    18

1   defendant's four-year old daughter.  And there is no question

2   that the imposition of any sentence effects the whole family.

3          And, there is simply no way to adequately gauge

4   that, I don't think.  But if the Court were to depart on that

5   basis, in the usual situations, I think we can all understand

6   how that would destroy any rational sentencing process.

7          Now, in this case, certainly, there is a very long

8   standing relationship, and there is a considerable age

9   difference and that Mr. Randi is an older gentleman, but as

10  has been indicated, he has certainly been capable of

11  international travel.

12         I don't minimize at all that there would be any

13  impact from a sentence whether it be-- whatever the sentence

14  would be.  But it would be my ruling that in this particular

15  case, the circumstances do not rise to the level that would

16  justify a departure under the section that has been cited.

17         Now, I want to be very clear in this regard, I

18  recognize that if you will, the landscape is different as

19  well, that the Court has latitude in the sense that the

20  guidelines once calculated, nonetheless remain advisory only.

21         But, in this effort to try to properly calculate the

22  guidelines, it would be my view that the defendant has not

23  come forth with, such extraordinary circumstances that would

24  justify a downward departure based on section 5H1.6 of the

25  sentencing guidelines.

- S E N T E N C E -                              19

1          Now, clearly people, parties have taken positions

2     and I'm not expecting anyone to back off those positions, they

3     are part of the record and would be capable of review, but in

4     light of the rulings that have been made here today, let's

5     walk through the presentence investigation report, just to

6     make sure that we have the right calculations in front of us.

7          If we begin on page six at paragraph 21, the total

8     offense level in this case is shown as a total offense level

9     of ten.

10          Moving over to page seven, at paragraph 24, and you

11     know, please forgive me because I want to use the correct last

12     name, I take it, the defendant's name is Mr. Pena; is that

13     right?

14          THE DEFENDANT:  Yes.

15          THE COURT:  I realize that Alvarez was something

16     used earlier.

17          But this shows that Mr. Pena is placed in criminal

18     history category 1, which is the lowest possible criminal

19     history category, and then moving forward to page twelve at

20     paragraph 53, the recommended guidelines imprisonment range is

21     a range of six to twelve months.

22          Do the parties agree that those are in fact the

23     correct calculations within the advisory guidelines?

24          MS. MITRANI:  Yes, Your Honor.

25          MS. DMITROVSKY:  Yes, Your Honor.

- S E N T E N C E -                    20

1        THE COURT:  Mr. Pena, I want to give you the

2   opportunity to speak in a few moments, and I want you to know,

3   I will be more than happy to hear whatever you would like to

4   say or any other information that you would like to present.

5        But, before I do that, the law requires that I ask

6   you a question and the question is, whether you are aware of

7   any problems or any difficulty really, anything at all that

8   would actually stop the Court today, and prevent the Court

9   from announcing any sentence at all in your case.

10       Are you aware of anything like that, sir?

11       THE DEFENDANT:  No.

12       THE COURT:  Thank you.

13       No legal cause having been shown, as to why sentence

14   of law should not be imposed, as I have said, I would be more

15   than happy to hear whatever you would like to say and if it is

16   all right with you, why don't I begin by turning back to Ms.

17   Dmitrovsky, and invite her to come up to the lectern to

18   present or say whatever she would like to say on your behalf.

19       If there is anyone else who intended to speak, I

20   would be happy to hear them and then turn back to Mr. Pena.

21       MS. DMITROVSKY:  Thank you, Judge.

22       Judge, I thought about what I would say last night.

23   I met Mr. Pena, Jose Alvarez as they call him and his partner

24   James Randi, in September of last year.  I can tell you

25   honestly, that in my, excuse me, but in my career, I have

- S E N T E N C E -                    21

1   never been so touched by so many people that I have gotten to

2   know through Jose and Randi.  So, I'm so honored and so proud

3   to represent a client as Jose.

4          This Judge is an extraordinary and compelling case,

5   and but for the attitudes in the United States, and of the

6   State of Florida, this couple would have been married long ago

7   and we would not be here today, and there would be no

8   prosecution today.  But they came together and there will be

9   no felony conviction which is a great consequence to Mr.

10  Alvarez, with potential deportation.

11         Had this country's attitudes toward homosexuals

12  changed long ago, as we have seen finally in the last few

13  years, in the sentencing memorandum, in the letters that you

14  have read, in the binder that you have on Davyi Pena's life

15  work, you will hear from him and Mr. Randi.

16         This case is an act of desperation of deliverance.

17  That is what Ms. Rudin said in her letter and I can't think of

18  a better way to put it, because you have read about it now and

19  you know more about it.

20         He became a citizen in the 80's.  But would have

21  been denied citizenship in the 80's because at that time, the

22  U.S. Government felt that homosexuality was a psychopathic

23  personality.  People were denied in the 80's citizenship for

24  that reason.

25         So, putting that in context, this person in a

RB        OCR

- S E N T E N C E -                                22

1   desperate attempt to survive, and an attempt to live in this

2   country with his partner, took a course that has come to this.

3           Now it has taken a long time to get here and the way

4   things snowballed and using the name Jose Luis Alvarez, which

5   as you know, he never knew was a live person in the United

6   States until it was confirmed last year.

7           This is a person who took a desperate act to do

8   something.  But that desperate act is the one crime that Davyi

9   Pena has committed.  I mean that binder shows you a life time,

10  since he has been in the United States, of what he has done

11  and what he has accomplished, of the places and people that he

12  has contributed to, the Kitchen is very famous in New York.

13  Fund raisers for the Locust project, visual aids for HIV and

14  AIDS.

15          The Norton Museum which you are familiar with, which

16  his entire mural encircles the lobby of the Norton Museum

17  right now.

18          Jack and Jill Children's Centers, letters from

19  people like Richard Dawkins, people who have lives that they

20  have little time to write a letter about someone like Jose

21  Alvarez.  Richard Dawkins, Carl Sagen, whose in the binder, an

22  entire chapter on the good work that James Randi and Jose

23  Alvarez have done to help people throughout the world.

24          Richard Adams, Penn and Gillette.  Richard Adams is

25  basically the inventor of the Internet with his-- what he

- S E N T E N C E -                    23

1   invented.

2          So, what I would say is, that this was a man who

3   made a mistake, a desperate mistake, because he saw no way out

4   years ago.  He continued to use that name and became a

5   success, he did.  He got three passports, he traveled the

6   world to do good for the James Randi Foundation.  He has never

7   had another mark on his entire career as-- his entire time as

8   a U.S. citizen, a proud U.S. citizen, not a U.S. citizen but

9   he loves this country.  He even signed up for the selective

10  service.

11         Which by the way, he would not have been picked

12  because as a gay man at that time, even if there was a draft,

13  he would not have been drafted by this country.

14         I will say a few things from his political asylum

15  application that I find rather poignant.

16         One, is that-- this was presented to INS or is going

17  to be.  He was able to get a birth certificate, social

18  security and passport, this was in 1984.  24 years old at the

19  time and no intention that it would be anything more than a

20  temporary way to remain in the United States.  That is why he

21  did what he did.

22         He had three U.S. passports issued to Jose Alvarez

23  the alias.  He lost the first one, then applied for another

24  one and a third one on November 28th of 2008.  He made several

25  trips outside of the U.S. to Spain, to Australia, to Korea,

- S E N T E N C E -                              24

1   all with Mr. Randi to support, showing people in these

2   countries the millions of dollars that are being defrauded

3   from, which is why Carl Sagen wrote that article.

4            And lastly, to tell you what he said is that, he has

5   lived a relatively quiet life in Florida over the last

6   25 years.  As time went by, this false identity became more

7   and more difficult for me to live with.  In one way, it was

8   not unlike my experience of growing up gay and having a secret

9   identity that no one knew about.  When he was arrested in

10  2011, a big part of him was relieved at finally being able to

11  tell the truth about his name and his identity and to stop

12  wondering if and when it would come to an end.  He is grateful

13  that it has come to an end, he's expressed that to me from the

14  first day I met him in prison, that the deep dark secret is

15  over.

16           All he would like is a chance to spend the rest of

17  his life, the remaining life of James Randi with him, which he

18  may not get to do, even if he stays out of prison because of

19  what he is dealing with Immigration.

20           So, I ask this Court to please go with the

21  recommendation of the PSI, allow Mr. Alvarez to stay with

22  James Randi for the rest of his life here and of course I am

23  going to ask the Government again, to-- because the Congress

24  has seen fit that it is not the Judge, but the Government's

25  request to a court, for an order of withholding of removal

- S E N T E N C E -                    25

1   which would allow Mr. Pena to stay here, and then it would be

2   re-addressed by the INS Court at a later time.

3          I think they are allowed to review it from time to

4   time.  But a withholding of removal would keep him here in the

5   United States to allow him to do the good work that he has

6   done, beautiful art work that he has done and be with his

7   friends and family.

8          Thank you, Judge.

9          THE COURT:  Thank you very much.

10         Is there anything else that you wanted to present,

11  any other folks who wanted to speak or anything.

12         MS. DMITROVSKY:  There are a few.

13         First, Judge, I have Barry Silver here who I think

14  you know, Mr. Silver since I have kept him so long, needs to

15  speak.

16         THE COURT:  All right.

17         Morning Mr. Silver, would you be good enough to

18  introduce yourself, please spell your last name for the Court

19  Reporter.

20         BARRY SILVER:  Sure, Your Honor, my name is Barry

21  Silver, S-I-L-V-E-R.

22         I am an attorney in Palm Beach County, also, a

23  Rabbi.  I wanted to speak on behalf of Mr. Pena if I might be

24  able to do so.

25         Thank you, Your Honor.

```
                    - S E N T E N C E -              26
```

1          I have an interesting legal practice which does a

2     lot of public interest work.  One of my cases involved a

3     number of people in Palm Beach County who had been swindled by

4     a psychic.  These people had lost their life savings.  I

5     represented about fifteen of them who were completely wiped

6     out.  People who were elderly who found themselves with

7     nothing left.

8          These people represented a small fraction of other

9     people who are too embarrassed or ashamed or was told there is

10    nothing that you can do.  The psychic had a pattern of wiping

11    people out, and the psychic was doing that in cahoots with the

12    City of Delray.  They had no money to pay an expert witness.

13    They came to James Randi.  James Randi volunteered without any

14    charge whatsoever, to serve as an expert witness regarding

15    psychics.  This is not something unusual for him.  He has been

16    doing it his whole life.

17         As a result of his expertise as an expert witness,

18    the psychic and a police officer, who was on the take, are now

19    in jail.  And my people, some of them have been starting to

20    get some of their money back.  This is one of the things that

21    he has done which is quite remarkable.

22         The Government's attorney said, you know this case,

23    she said, is no different than other cases, there is always

24    family who is adversely effected.

25         Your Honor, this case is completely different

- S E N T E N C E -                    27

1  because it is not a family who is going to be effected, which

2  it is.  It is the entire world which will be effected if Mr.

3  Randi is compromised or not able to go on.

4          I would like to offer some other tidbits of

5  information about what he has done.  I know Your Honor has

6  received a lot of information from people all over the world.

7          First of all, he met with my children and my

8  children still talk about that visit.  He came to my

9  congregation, my congregrants are still raving about what an

10  amazing person he is.

11          When I have announced he was going to come there,

12  people from all around said, we love James Randi, he is an

13  idol.  We know him so well.

14          Mr. Randi has an amazing ability to connect with

15  people on an issue which is so urgent.  That is, the use of

16  science and reason to counteract many forces in this world

17  that are very dangerous and very harmful.  In the realm of

18  religion, psychics, in the realm of the misuse of science.

19          His service of humanity is essential, and it is

20  something that is totally different than any case that has

21  been cited or any guidelines that has been cited.  Because we

22  don't have a family, we have an entire community and a world

23  community.

24          So, I would urge the Court, whatever discretion you

25  have, should be exercised and finally, Your Honor, also as a

- S E N T E N C E -                    28

1   Rabbi, I know that our legal system and Your Honor said this

2   also, Your Honor started out by saying, these guidelines

3   represent an effort to make the sentencing procedure more fair

4   and that is something that is so important.  Fairness is

5   sometimes overlooked.  But that should be the overriding

6   concern of this Court.

7            What is fair, is for all these other factors to be

8   taken into account.  What is fair is to recognize that Mr.

9   Pena on his own, has done so much for humanity and also he

10   facilitates what Mr. Randi is able to do.

11            Mr. Randi sure, he can perhaps find somebody else to

12   take care of him.  Financially that would be difficult.

13   Finding somebody else to emotionally support him, to work as a

14   team and we've seen throughout history, people who contribute

15   a lot to humanity, part of the reason they do that, they have

16   somebody who is able to emotionally support them in his

17   efforts.

18            The fairest thing to do under the circumstances, is

19   to allow Mr. Pena to not face any jail time, and to be with

20   Mr. Randi.  I see this as a completely victimless crime.

21   There has been no victim here.  The only effect, that Mr.

22   Pena's actions have had on this country have been a beneficial

23   one.

24            If he is forced to go to jail then there will be a

25   lot of victims and the victims will be the American society

- S E N T E N C E -                    29

1    and the people of this world.  I would urge the Court to

2    exercise any discretion it can on his behalf because that

3    would be in his best interest and also the best interest of

4    humanity.

5               I thank you for the opportunity.

6               THE COURT:  Thank you very much, thank you for being

7    here.

8               Anybody else?

9               MS. DMITROVSKY:  Next would be Mr. Ver Ploeg.

10              THE COURT:  Morning, sir, thank you for being here.

11   Would you be good enough to introduce yourself and to spell

12   your-- maybe spell your full name for the Court Reporter so we

13   are sure it is properly in the record.

14              MR. VER PLOEG:  That is probably necessary.

15              My name is Veenton Ver Ploeg, V-E-E-N-T-O-N, Ver

16   Ploeg.  Is two parts.  V-E-R, and P-L-O-E-G.

17              I am an attorney, I am in Miami.  It was a little

18   over 20 years ago, more or less, at the time that I was trying

19   a three-week case in front of Your Honor, in Palm Beach County

20   that my first effort at suing an insurance company.

21              When I became aware of the fact that there were

22   skeptical organizations in the United States, who were in the

23   business, essentially of defending the scientific method in

24   the courtroom, and only when they got sued of course, did they

25   have to go to the courtroom.

- S E N T E N C E -                          30

1       I began that work, I have been doing it now for over

2   twenty years at the rate of $1 an hour.  Which seems

3   appropriate under the circumstances, and if you are going to

4   do that kind of work, the central clearing house for any

5   library, any kind of reference that you can possibly have is

6   James Randi.

7       So, through another case, I initially became

8   introduced to James, and after that point, and throughout this

9   time, I have been representing Mr. Randi in court, and out of

10  court in some cases.

11      And in concert with that, is when I met and I am

12  just going to have to call him Jose, because that is the frame

13  of reference that I have had.  I met Jose right at the outset

14  of meeting James.  I began to understand immediately that he

15  was an artist that was going to be rising.  At the time he was

16  working out of a studio in the back of the house, which was

17  half submerged in the Everglades as far as I can tell.

18      That prominence has continued to rise.  I now have--

19  I'm an art show junky and have more art stowed in my closet

20  than I can think of.

21      In my living room is one of Jose's pieces with the

22  central feature of the house, being a light on it and

23  everybody commenting on it.

24      More to the point, I think and have thought of this,

25  throughout the entire time that I have been doing this

- S E N T E N C E -                    31

1    representation, as not being a single handed effort by Mr.

2    Randi, but a joint effort of a team.  A team that is assembled

3    in a way that I really have never seen before.

4           I have not done divorce work for 35 years, I am

5    happy to say, but I don't think that one couple in one

6    thousand, maybe a couple in ten thousand, could be working

7    together as a team, in the way that I saw James and Jose

8    working together. This was a partnership which had community

9    support of international consequences as far as I'm concerned.

10          This team was lampooning or harpooning the psychic

11   world in many cases, cases which began in Federal Courts in

12   California which led to Federal Courts here, which led to

13   Federal Courts to grant as far as I know, the only two cases

14   that I can think of, where a motion for compulsory psychic

15   examination was granted by the Court, and perhaps needless to

16   say, the proponents of those cases failed psychic

17   examinations.

18          This work is so important, I can't even count, I

19   tried to for a Federal Court in Texas one time, the dollar

20   amount that has been saved by the teamwork that these two have

21   put together.  But, it is way way way passed eight figures.

22          And, I get emotional about this, because I am now

23   thinking of the event of Randi's most recent birthday party,

24   up in DC.  It was on a Sunday night.  I had a hearing Monday

25   afternoon and I was not encouraged to go in my own mind to a

- S E N T E N C E -                      32

1    Sunday night birthday party.

2            Jose called me and he asked me to please appear,

3    that it was really important to Randi and he really wanted me

4    to be there.  I went.  It is probably one of the best

5    experiences that I ever had in my life.  Not only the people

6    that gathered to commemorate the work that these two have done

7    and they have done it together, but also, the presentation

8    that Jose put on, in the form of a video, that he had

9    assembled of Randi's retrospective existence of his life,

10   career, the things that he has brought to the community and to

11   the world.  And I don't think there was a dry eye in the place

12   when it finished running.

13           I have taken a thumb drive of that home to my

14   computer that Jose provided and I have shown it to a dozen

15   people myself, with I think the same result.

16           I echo what you have heard from Mr. Silver.  If this

17   is not a victimless crime, then the victim if any there be, is

18   well equipped to resolve that, where it needs to be resolved

19   and that is a civil courtroom.

20           If there is anything to that whatsoever, that is the

21   place to work it out.  And in this case, to the extent that

22   leniency can be considered and granted by the Court, the

23   equities of this, I have never been a criminal lawyer, I can't

24   imagine sitting in judgment on the lives of people and I know

25   how difficult that is.  But if ever there was a case for

- S E N T E N C E -                              33

1   leniency and to employ the best judgment that you can, in

2   terms of the fairness that you can allocate to the-- not just

3   the defendant, but to the public at large and to the nation,

4   this is the case.

5          Thank you.

6          THE COURT:  Thank you very much.

7          MS. DMITROVSKY:  Judge, Sara Gavlak would like to

8   speak.

9          THE COURT:  I want to just to stop for a second and

10  let me-- how many folks do you have that want to speak this

11  morning?

12         MS. DMITROVSKY:  Well, Your Honor, I actually asked

13  everyone to keep it to two or thee minutes.  Ms. Gavlak would

14  like to speak.  Although, I would-- James Randi would be next

15  and I am sure Ms. Gavlak would give up her time for Mr. Randi.

16         THE COURT:  I would be happy to hear anybody that

17  wants to speak, but let me explain, we have a rule that if a

18  sentencing is going to take over an hour or so.  We need some

19  advance notice.  I didn't get that.

20         And I notice Mr. McMillan has just come in on a

21  matter that was set to begin at 11:30.  If there is a great

22  deal more, what I was going to suggest, we take a recess.  Let

23  me handle the other matter so that the parties can move

24  forward and then I will be happy to come back and take as much

25  time as we need to take.

```
                        - S E N T E N C E -                    34
```

1        MS. DMITROVSKY:  Okay.

2        THE COURT:  Would that make sense.

3        MS. DMITROVSKY:  Judge, I will--

4        THE COURT:  Let me double check is Mr. Chris here?

5        Hold on.

6        Does that make sense, I think.

7        MS. DMITROVSKY:  It does.

8        THE COURT:  You probably have more folks that want

9   to speak.

10        MS. DMITROVSKY:  Actually, I can go straight to Mr.

11   Randi.

12        THE COURT:  I will let you handle it anyway you

13   would like.

14        MS. DMITROVSKY:  Thank you.

15        THE COURT:  I think we need to take that break.

16        Ladies and gentlemen, let's take a brief recess, let

17   me handle another matter and then I will come back and have

18   plenty of time and be happy to hear anybody that would like to

19   speak.

20        (Whereupon, a recess was taken.)

21        THE COURT:  Let the record reflect, we are returning

22   to case number 11-60228, this is the case of the United States

23   of America versus Mr. Deyvi Ortangel Pena or also known as

24   Jose Luis Alvarez.

25        I think when we stopped the defense was about to

- S E N T E N C E -                    35

1   present another person who wanted to speak on behalf of Mr.

2   Pena.

3            MS. DMITROVSKY:  Yes, Sara Gavlak.

4            THE COURT:  Morning ma'am, thank you for being here.

5            MS. GAVLAK:  Morning.

6            THE COURT:  Would you be good enough to introduce

7   yourself and to spell your last name for the record.

8            MS. GAVLAK:  Sara Gavlak, G-A-V-L-A-K.

9            THE COURT:  Thank you.

10           MS. GAVLAK:  Morning Judge Hurley or afternoon now.

11           THE COURT:  Afternoon.

12           MS. GAVLAK:  I will also refer to Jose as Jose

13  Alvarez, that is how I know him.

14           THE COURT:  I must tell you that I thank you, and I

15  had many many submissions.  One of the things I did this

16  morning was to go to your website so that I could see some of

17  Mr. Alvarez' paintings which you have beautifully displayed on

18  your website.

19           MS. GAVLAK:  Thank you.

20           THE COURT:  Explanation of your gallery and some

21  other artists that you represent.

22           MS. GAVLAK:  I'm glad you got to look at that, thank

23  you so much.

24           That is why I felt it was important for me to come

25  here and speak.  I know we heard a lot about Jose's

- S E N T E N C E -                       36

1   relationship with Randi which is so important.  But I want to

2   speak about Jose as an artist, that is so important.

3        I have extensive experience in the art world, for

4   the last fifteen, over fifteen years.  As a gallery, I have

5   had my gallery for six years.  I have written, I am writer, a

6   curator, all over the world.  Japan, Europe, L.A., New York

7   and in my opinion, the first time I ever met Jose when I moved

8   here to open my gallery, I was highly recommend by Lawrence

9   Render(phonetic), who is a curator at the Whitney that I

10  worked with.  Amy Capalwitz(phonetic), now is the head of

11  Christie's in New York, that I go see this incredible artist.

12  They both said you have to see this artist.

13        When we finally met, I walked into his studio and

14  was completely blown away.  This is after studying art history

15  and critical theory and a master's degree and seeing lots of

16  art. I could not believe that this talent was actually

17  residing here in South Florida.

18        And we immediately began working together, I put his

19  work in a group show, just which I usually do to vet or test

20  out the relationship and the artist.  And that first

21  collaboration we sold a piece of his to Milton and Sheila

22  Fine, who are incredible art collectors.

23        They are on the board of the Carnegie Museum of Art

24  in Pittsburgh, one of the founding board members of the Warhol

25  Museum of Pittsburgh, on the University of Pittsburgh Medical

- S E N T E N C E -                    37

1  Center Board.

2          He is very involved in the Norton here and they

3  immediately gravitated toward the work.  They have an

4  incredible collection of everything.  I mean I could list the

5  artists that they have, including Jose Alvarez.  They love the

6  work.

7          You know I think the thing that is really important

8  for Jose, and for me to tell you about Jose's work is, it is

9  incredibly powerful and incredibly moving.  And across the

10  board, people who know his-- come in contact with his work,

11  whether they are the most sophisticated art collectors or just

12  people who just like it was discussed, you know his mural is

13  still at the Norton Museum from the exhibition he was in.

14          Across the board people come in contact with his

15  work are moved by it.  They always say it is so happy, it has

16  such an energy.

17          And, I think in this moment in our history, that it

18  is not something to take lightly or to just dismiss. The fact

19  that an artist is able to communicate a joy, an exuberance, a

20  sort of ectasy, the excitement of living.  I mean that is who

21  Jose is and what he brings to the art world and his art.

22          I mean it is-- he is a unique talent, nobody is

23  doing work like he is.  And, that is the reason museums, you

24  know spaces in New York, like the Kitchen, Debra Singer who

25  was at the Whitney, moved to the Kitchen to direct that space,

- S E N T E N C E -                    38

1   she said to Jose any time you wanted to do a show, I'm ready

2   to do it.

3          The Norton Museum, I took Sheryl Brutman(phonetic),

4   who is the curator for contemporary art to Jose's studio, and

5   she built that exhibition, altered states, around Jose's work.

6   She took two other incredibly well known artists -- and Fred

7   Tomaselli, all much more established artists and basically

8   built the exhibition around Jose's work.

9          You know, his work is collected by people who are on

10  the Boards of the Metropolitan Museum of Art, the Guggenheim,

11  the Whitney, Moma, I mean you name it, he is in incredibly

12  prominent collections.

13         And, you know, I think it is really important also

14  to point out that while he was under house arrest, he was

15  continuing to work as an artist making incredibly beautiful

16  collages that were brought to the gallery and immediately

17  placed in great collections.

18         He worked on a video piece that is going to be

19  exhibited on the Sunset Strip, the Cosmopolitan Hotel has a

20  partnership with the art production fund in New York and it is

21  called P.O.S, the idea when you come down the Sunset Strip

22  there is an artist project on the jumbotron.

23         The first one was Yoko Ono and T.J. Wilcox, both

24  obviously -- Yoko Ono is well known as an artist.  The second

25  edition of that is Jose's piece.

- S E N T E N C E -                        39

1          And he finished that piece, while he was on house

2    arrest.  And, I think--

3          THE COURT:  Take a minute now, I want to hear what

4    you have to say.

5          MS. GAVLAK:  The thing that is so important about

6    this, it is not just working with Jose changed my life and

7    enriched it tremendously, we built something together.

8          I started out my gallery six, seven years ago, Jose

9    started working together then.  Together, we have grown up and

10   his career and in the gallery and--

11         THE COURT:  Do you still maintain the space in West

12   Palm or did you move it.

13         MS. GAVLAK:  I'm on Worth Avenue.

14         Jane Hoser who is a member of the community and a

15   very prominent art collector actually just bought a large

16   piece of Jose's, that he also made while he was under house

17   arrest.

18         And, but the thing I want to really say about Jose

19   is that, you know, with all this going on, you know for

20   artists who are truly passionate about what they do, and the

21   reason he is successful is because this is not just a hobby,

22   this is not just a vocation, it is not like-- it is not a nine

23   to five thing.  This is what he lives and breathes.  This is

24   who he is.  He is an artist and it is-- I mean it is like his

25   oxygen and to-- take that away, or to prevent him from doing

- S E N T E N C E -                    40

1   it, in any way, would be one of the biggest tragedies, I can

2   imagine because the world really needs to see his work.

3          I mean, I am out in Palm Beach and someone says,

4   what do you do.  I have an art gallery.  Who do you show.

5   Have you been to the Norton, that big mural is an artist I

6   show.  Wait hold on.  Then they show me pictures of their

7   children posing in front of his mural.  Everyone loves it.

8          THE COURT:  Yes.

9          MS. GAVLAK:  There was a demand to keep it up.  It

10  was supposed to come down almost a year ago and they've kept

11  it up because it is part of the museum.  People are arguing it

12  should just be permanent because it lifts people up and that

13  is what for me, and the art I show, is something that I think

14  is important.  It is rare these days and I know you -- sounds

15  like you know contemporary art or art and there is not a lot

16  of art that does that.

17         And, Jose has a rare vision and a rare gift and a

18  rare talent and there are so many opportunities coming up for

19  him to contribute creatively to this world and make it better.

20         THE COURT:  Thank you.  Thank you for waiting.  I'm

21  sorry that I had to ask you all to do that.  I appreciate your

22  thoughts today.  Thank you.

23         MS. DMITROVSKY:  Judge I'm honored to present James

24  Randi.

25         THE COURT:  Morning Mr. Randi, thank you for being

- S E N T E N C E -                    41

1    here.

2            Would you be good enough to introduce yourself and

3    to spell your last name for the Court Reporter.

4            MR. RANDI:  My name is James Randi, R-A-N-D-I.

5            THE COURT:  Thank you, sir, go right ahead.

6            MR. RANDI:  Thank you, Your Honor, thank you for

7    this opportunity to say my thoughts.

8            I have observed over these many years that I have

9    been in existence, that no living creature can make choices

10   about two things in their existence, first of all, who their

11   parents will be or second, where they will first emerge to see

12   the light of day.

13           I imagine that most people in this courtroom,

14   suffered from an accident at birth, which made them citizens

15   of the United States, but there are two exceptions here, Davyi

16   Pena and myself.

17           But we have somewhat similar life stories to a

18   certain extent.  I first entered the United States of America,

19   on a work visa from Canada, and I was eventually admitted

20   under a category H1, which is said to be a person of

21   distinguished merit of ability.  How true that is, I won't

22   argue the point.

23           But nonetheless, I accepted that and I actually

24   became a permanent resident of the United States traveling on

25   my Canadian passport to all parts of the world.

- S E N T E N C E -                42

1       And, I got a radio job, not just a simple radio job.

2   No, I landed a radio job that enabled me to speak to 38 states

3   from midnight to 5 o'clock in the morning with WOR radio, in

4   New York City.

5       Now, that is a huge audience, literally, sir,

6   millions of people.  38 states, parts of Mexico and parts of

7   Canada as well.  That is millions of people.

8       During that sojourn, I took some time off to join a

9   rock and roll show, a show frankly, I was one of the actors in

10  that particular production.

11      And, I got to Niagara Falls, Canada, I was back home

12  temporarily and I ran into a problem with the RCMP, the Royal

13  Canadian Mounted Police, the Canadian federal police.

14      I found them when I had to make a costume change in

15  the middle of a show, I went to the dressing room, I found

16  them trashing the dressing room, and I argued with them, I was

17  badly treated, pushed around a great deal.  I was insulted by

18  them.

19      They trashed that dressing room because they had

20  been looking for narcotics, used by the musicians.  They found

21  none so they took revenge on us.

22      That brought me a certain epiphany, I must say.  I

23  decided that I would rather be a citizen of the United States.

24      But before I did that, Your Honor, I took a visit

25  out into New York harbor.  I visited that great lady, standing

- S E N T E N C E -                    43

1   in the harbor with a torch above her head for all the world to

2   see, I went inside and I read the beautiful poetry inscribed

3   at the base of that statute.  We all know the poem.

4           Give me your tired, your poor, your huddled masses,

5   yearning to breathe free.

6           But a little later on, in that poem, I noted this

7   phrase, send these, the homeless, tempest tossed to me.  I

8   lift my lamp aside the golden door.

9           Well, Your Honor, I too was tempest tossed back in

10  my homeland of Canada, because of my sexual orientation and

11  for other reasons.  But certainly not anywhere nearly as

12  seriously as Davyi Pena.

13          He barred scars Your Honor, not only on his face but

14  on the rest of his body from run ins that he had with the

15  police in Venezuela, because of his orientation.  He is badly

16  scared, but you can't see the emotional scars.

17          Now, at that point in my career, I had the financial

18  means, the influence and the connections to become a citizen

19  of the United States of America.  It was very easy for me.

20          I was summoned to a courtroom in Freehold, New

21  Jersey and I met there with a crowd of more than thirty other

22  people, of all sizes, shapes and descriptions that you can

23  imagine, speaking many different languages, were all smiling

24  at one another because we knew why we were there.  We were

25  there to become citizens of the U.S.A.

- S E N T E N C E -                    44

1           It was a wonderful moment.  And some of them, as I

2    looked around the room, Your Honor, I saw that some of them

3    were weeping, but these were not tears of grief or fear or

4    sorrow, these were tears of joy.

5           I was told by the Magistrate, you should raise your

6    right-hand and swear the oath of the allegiance to the flag of

7    the United States of America, and to the republic for which it

8    stands.  We all know that poetry as well.

9           I did so and I saw the tears streaming down these

10   people's faces, and I suddenly realized that I too was

11   weeping.  I was unaware of it up until that moment.

12          Now, Your Honor, this paper wall that I have had

13   with me for so many years, and it contains all the really

14   valuable papers that I have in my possession.  But one piece

15   of paper here, is printed on both sides.  It bears the title,

16   "Certificate of Naturalization" and the number at the top of

17   that, is serial number of this, is in the twelve millions.  It

18   is dated February 20th, 1987.

19          Davyi Pena doesn't have such a magical piece of

20   paper and now he never can have such a piece of paper.  I ask

21   you a rhetorical question, just rhetorical, Your Honor, the

22   possession of this piece of paper, mean that I am a better man

23   than Mr. Pena?  Aside for the difference in our ages of

24   course.  Does that make Mr. Pena any less valuable than I?  I

25   don't think so, no.

```
                    - S E N T E N C E -                    45
```

1      But, I was also given something else that day and I

2  have it here.  This is my flag, I'll never part with it and at

3  our home on the fourth of July, we unfurl this flag and fly it

4  proudly and on other occasions as well, that we believe are

5  important.  I will never part with this.  This is my flag,

6  given to me by the Magistrate in the courtroom who led us in

7  the pledge of allegiance.

8      But Deyvi Pena much much more than I, Your Honor,

9  was also tempest tossed, he was cruelly treated, he was

10  discriminated against, he will tell you something about that

11  I'm sure.

12      And he frantically pursued the only means he had of

13  rescue since he had no money, nothing but school diplomas,

14  though diplomas of very high ranking with great commentaries

15  on them.

16      He took the identity of a man who he had been told

17  had died at the age of seven years that turned out to be

18  incorrect.  That is what brought him to this courtroom today.

19      As for that crime, no attempt has ever been made to

20  lessen the impact of what he did, it was a crime.  It is a

21  hard fact.  But Your Honor, this was a crime of desperation,

22  in which no one was hurt, no one was robbed, no money was

23  exchanged, no threats made and no one was cheated.

24      Mr. Pena, has lived an exemplary life here in the

25  United States, contributing always to his environment, both

- S E N T E N C E -                    46

1   artistically and charitable and though this is not the matter

2   under discussion today, it has been mentioned previously,

3   Deyvi Pena has cared for me too on several occasions during

4   the past few years.  I have awakened following emergency

5   medical procedures in Broward General Hospital, surrounded by

6   white sheets and pillows, but when my hand held by my partner,

7   for me no greater sense of security exist, that can't be

8   bought.  It can only be granted.

9           Our President Barack Obama just recently expressed

10  his approval of same gender marriage, if this had happened

11  earlier in our history, I think we would not be in this

12  courtroom today, but that is a matter of circumstance.

13          My appeal to this court, and I know that these good

14  people who have come along with us today, this is only a small

15  representation of those who could have been here.

16          They will agree, that Deyvi Pena is a good man, he

17  offers no threat at all to the United States of America, and

18  there is no threat of him fleeing, Your Honor.

19          We believe, we hope, that he should be given at the

20  very least the opportunity of remaining in this great

21  community known as the United States of America.

22          Deyvi Pena has the quality, character and the

23  skills, to make all of us, all of us very proud that we stood

24  by him in this unfortunate time.

25          Your Honor, I will close this semi tirade for which

                    - S E N T E N C E -                    47

1    I apologize with one word, I'm simply asking you, Your Honor,

2    to express compassion in this matter.

3              Thank you.

4              THE COURT:  Thank you Mr. Randi, thank you so much.

5              MS. DMITROVSKY:  Judge, I have only Mr. Alvarez who

6    would like to give a statement.

7              THE COURT:  Thank you.

8              Afternoon, sir.

9              THE DEFENDANT:  Good afternoon, my name is Deyvi

10   Pena, D-E-Y-V-I, P-E-N-A with a sign on top.

11             First, Your Honor, I want to express my deepest

12   apologies to this court, to Ms. Bertha, to Agent Justice

13   Conchola(phonetic) and to everyone in the U.S. Government that

14   has been involved in one way or another, to my partner, my

15   family, my friends and colleagues, for having kept this secret

16   for them for so long.

17             To Mr. Jose Luis Alvarez, for any inconvenience,

18   misunderstanding --

19             THE COURT:  Hold on now, because I really do want to

20   hear what you have to say.  Take a deep breath that is all

21   right.

22             THE DEFENDANT:  For trouble or damage that I may

23   have inadvertently caused him.

24             I am finally, but especially to the United States of

25   America, for having taken something that did not belong to me.

- S E N T E N C E -                    48

1    I accept full responsibility.

2            However, I didn't do this out of malice or with

3    intent to cause any harm to anyone.  It was done out of sheer

4    desperation.  I was born in a very religious and conservative

5    family in a country where the cultural and religious

6    environment perceives homosexuality as a sinister character, a

7    moral deviant.  A country where homosexuality is criminalized.

8            There is a law named, (words in Spanish). Which

9    translates as the law of vagrants and miscrets(sic), or

10   vagabonds and under this law, any action against a homosexual

11   person is justified and even promoted.

12           Since I was a little kid, I was very aware, that to

13   like boys was tantamount to being the worst of society and a

14   danger to it, and that my natural affection for another human

15   being was considered an aberration.  Something that needed to

16   be silenced, expelled, and ultimately even killed.  That was

17   what I knew about being gay in Venezuela before coming to the

18   United States.  I tried my hardest to pass, to become

19   straight, to have girlfriends, to no avail.

20           I wanted very badly that my father, my family, my

21   country, will be proud of me, by keeping myself alive at the

22   same time.

23           Out in the world, I was bullied, beaten, humiliated,

24   shot at, abused by the Venezuelan police and several times, a

25   gun was put to my head.  Simply because all of them felt they

- S E N T E N C E -                    49

1    had a legitimate reason to do so.

2              After all I was just a faggot, the possible

3    degenerative trash.  There was relentless persecution, raids,

4    beatings, and a concerted effort to publicly humiliate

5    homosexuals and publishing their photographs in the local

6    paper, branding them as perverts.

7              I learned very early on, that in order to survive, I

8    needed to keep quiet and to pretend.

9              I was living in an intolerable situation, I made my

10   decision to leave the country.  After a few attempts at living

11   elsewhere, I came to the U.S., and here I find a place in the

12   world.

13             I just needed a chance.  A little chance and an

14   opportunity to self emancipation, for self realization.  I

15   just wanted an opportunity to live openly and free.

16             Years went by, and I could not find a way to

17   normalize immigration status, the U.S. didn't recognize my

18   relationship and they didn't see a reason to legitimize my

19   reason for being here.

20             I didn't have any way to stay here, and the option

21   of having to go back was impossible for me.  I was afraid for

22   my life.  So as a desperate measure, I took this false

23   identity, once it was assured to me that it didn't belong to

24   anybody.  I didn't know that there was a person with this

25   name, that is still alive.  It was a mistake, I admit it.  But

- S E N T E N C E -                    50

1    given the circumstances, a necessary one.

2            I have-- I would never have taken such a desperate

3    measure if it would have another choice, if I knew that it was

4    going to negatively impact somebody's life.

5            I met my partner and I built a life.  I found a

6    wonderful circle of friends, a family that cares for me and

7    supports me and give me hope.  A family that doesn't judge me

8    or diminish me.  I tried the last 30 years that I have been in

9    this wonderful country to be the best person that I could be.

10            I had made myself available whenever needed to help

11   ease other people's pain, and aid in their troubles.  I have

12   tried to do the best of my ability to live an exemplary life.

13   It was never my intention to cause any trouble to anyone and

14   to this day, I would like to read a letter that I wrote for

15   Thanksgiving to my friends, that is when I left my

16   incarceration.

17            Dear friends:  I want to take this opportunity to

18   tell you how much I love you all.  Please know how much I

19   appreciate and forever will, your kindness, support and

20   understanding, because of you, I was able to sit with my

21   beloved Randi in this most wonderful Thanksgiving and fill my

22   heart with joy, pleasure and internal gratitude to you all, in

23   knowing how fortunate I am in having so beautiful and caring

24   and wonderful friends by my side.

25            I have gone through some very difficult times but

- S E N T E N C E -                    51

1   they were only eased by the fact that I knew you were out

2   there showing me your love and support.  Many times I thought

3   I would not make it, but I did because of you, because of

4   Randi, and because of my art.  Art gave me a life in there,

5   literally, now more than ever, I know very clearly why my work

6   takes the form it does, because art heals.  Because when you

7   are stripped of everything that is dear to you, and you are

8   left with nothing, when a system tries to reduce you to

9   nothing, art can keep you alive.

10           Now more than ever, I'm complete.  I am convinced,

11  that what the world needs is hope, compassion and

12  understanding, and when you are surrounded by darkness and

13  ugliness, the only thing you want to see and imagine and make,

14  is the most beautiful objects that can transport you to a

15  better world.  Where a darkness and sorrow don't exist, but

16  are replaced by hope and compassion.

17           By kindness and love, by beauty, a world of immense

18  wisdom and understanding.  A world of total belief in the

19  power of the object to make you into a better person in

20  keeping you afloat with nothing else.

21           But art was not the only thing, without you, I would

22  not have made it.  I have friends who helped me financially to

23  get out of debt.  Thank you.  Forever thank you.

24           I have friends who invited us to move into their

25  homes, once all of this situation got resolved if we never

- S E N T E N C E -                      52

1   needed to.  Friends who send me scratch pads and pencils for

2   me to draw with the most touching and beautiful captions from

3   them.  Friends who offered to come down and take care of

4   Randi.  Friends who sent cards and letters to that place, and

5   I kept their cards and letters clutched in my hands for days.

6           Because I feel I was loved and safe, if I had them

7   with me at all times.  Friends that came to visit me during

8   visiting hours, and friends who took care of my garden when I

9   could not.  Friends who were always there, in every court

10  hearing, however brief, showing me their love and support.  I

11  cry many times, in all of this, sometimes not quite

12  registering that I was that important to you all, and it made

13  me so humble to know it, thank you.

14          I have friends who send the most beautiful letters

15  to the Judge to read.  Send the most touching and beautiful

16  things about me.

17          And I believe in goodness and beauty and love.  I

18  have friends who send letters from all over the world, thank

19  you, thank you.

20          I have friends who will come to our home and take

21  Randi out to eat or just talk, when things were just too much

22  for him.  Thank you.

23          I have friends who defended my name, when the only

24  made up their minds about me with -- without having heard my

25  story.  Thank you.

```
                    - S E N T E N C E -                    53
```

1    My wonderful lawyer Susan, who hurt her arms and

2  heart open, when I was simply too distraught to make any sense

3  and kept my focus on all of you and Randi and not letting that

4  place get the best of me.  Thank you.

5    I learned to practice to save my road to inner peace

6  and tranquility to gain strength and acceptance and to manage

7  the situation.  I learned a lot while I was there.

8    Most of all, I learn about the power of love and art

9  to heal.  And today, I celebrate, I celebrate the fact that

10  I'm also fortunate to have crossed paths with you in my life,

11  that I have shared beautiful moments with you, and that we

12  never forget what you have done for me.

13    I celebrate the fact that I was sitting at home with

14  the most beautiful and kind and loving person in the world,

15  and we were fortunate to be together today.  I don't know what

16  would happen, but I am very proud of who I am and what I have

17  accomplished in my life.  I consider myself a good person who

18  always thinks about the welfare of my fellow man.  I don't

19  know any harm anybody, I don't harm people.

20    Today, I celebrate the fact that no matter what the

21  world says about me, I know that you know that, so thank you

22  for having shown me that.  For believing in me and for more

23  beautiful times together.

24    With the utmost respect, love.

25    Your Honor, I am so very sorry.  I intend to

- S E N T E N C E -                    54

1   continue contributing to my community as much as I can, in the

2   way that I've been doing it, throughout all these years as

3   much as I can.  My situation, I have been compromised and I am

4   paying very dearly for all this and with immigration

5   proceedings coming.

6           If I will have been a straight man in a heterosexual

7   relationship, I would have had a much easier time.  Now,

8   thirty years later, we are still cannot get married because

9   people think that two men sharing their life together would

10  bring civilization to destruction.  Nothing has changed, but

11  some steps have been taken in the right direction by the

12  president in the last few weeks.  This is an inherent

13  fundamental human right.  Maybe those changes will come too

14  late for us, but it should not be that way.

15          Lastly, I just want to say, I'm very sorry that I

16  caused any trouble to Mr. Alvarez, to the United States

17  Government, it wasn't my intention, sir, it really wasn't.

18          Thank you.

19          THE COURT:  Thank you Mr. Pena.

20          Does that conclude the defense's presentation?

21          MS. DMITROVSKY:  It does.  I wanted to ask one thing

22  very short, if you want me to put on the record, about the

23  3553 factors?

24          THE COURT:  I am willing to hear-- I thought you

25  made that presentation.  This is your time to do whatever you

- S E N T E N C E -                    55

1    want to do.

2              MS. DMITROVSKY:  I'm sorry.  I will make it very

3    brief.

4              I would just say as I did in the sentencing

5    memoranda, that I would ask for a variance because of 3550--

6    3(a), part one, the nature and circumstances of the offense

7    and why this happened.

8              And, a factor of the history and characteristic of

9    Mr. Pena.

10             Also that the sentence needs to reflect the

11   seriousness and provide punishment and afford adequate

12   deterrence which I think it does in this case.

13             THE COURT:  Can I give you a moment.  This is the

14   problem that I face.

15             MS. DMITROVSKY:  Okay.

16             THE COURT:  Everything that you have said, I don't

17   think anybody disputes any of it.  This is a man who in the

18   United States, has done wonderful things and as has been

19   suggested, he is a source of creative energy, that has brought

20   beauty and everything.  He is a man who has been a faithful

21   partner and done so much and has many friends.

22             Here is the problem.  This is a man who on three

23   separate occasions, has falsified a passport application, and

24   frankly is guilty of aggravated identity theft.  I mean the

25   Government in a very magnanimous way, elected not to charge

- S E N T E N C E -                    56

1   that, but he used the name of a real person, the Court of

2   Appeals has told us is not determinative whether the person is

3   alive or dead.  The man happened to be alive.

4          MS. DMITROVSKY:  Right.

5          THE COURT:  That is the problem that I have, and the

6   problem that I have to face.

7          MS. DMITROVSKY:  I'm sorry, Judge.

8          THE COURT:  The message that goes out to other

9   people, with this type of a crime, particularly in this post

10  9/11 world that we live in.  We have border security and

11  matters like that, are of a heightened concern.  That is the

12  problem and that is, we have talked a lot about Mr. Pena, the

13  person and all of that is highly relevant and I don't question

14  any of it.

15         But I am concerned about the message that goes out,

16  and how about all those other people, the people who come back

17  into the United States because they want to be with their

18  wives, or their children, the relationships that they have

19  developed while they were here, and are forever barred.  On

20  top of that are put in jail.

21         How do you rectify all of these things, in terms of

22  the crimes that were committed here.  These are serious

23  crimes.

24         MS. DMITROVSKY:  They are serious crimes, Your

25  Honor.  Especially given the 9/11 and of course, I'm sure

- S E N T E N C E -                    57

1   there are people that would look at this and say, how is it

2   the Government didn't figure this out.   I mean how safe are

3   we?

4           But I think if you think of the factors, we know

5   that Mr. Pena is not going to do this again.   We know that the

6   public does not need to be protected from any other crimes

7   from him.   We know that he faces big INS consequences.

8           THE COURT:   How do you deal with the concept of

9   general deterrence?

10          MS. DMITROVSKY:   I think you have to look at what

11  the first part of the factors are, the nature and the

12  circumstances of this offense.

13          For someone who is just coming back into the country

14  to be with their family, I think that is different than

15  someone who has been here and had a solid relationship here

16  and has been a very productive member of society.   Rather than

17  just wanting to come back and do that.   I think that is where

18  the nature and the circumstances of this case are different.

19          I had mentioned in the sentencing memorandum, Your

20  Honor, do you mind if I just take a quick step to the

21  bathroom.

22          THE COURT:   Of course.

23          MS. MITRANI:   Maybe I should check to see if she is

24  okay.

25          THE COURT:   Would you please, thank you.

- S E N T E N C E -                    58

1          (Whereupon a recess was taken.)

2          MS. DMITROVSKY:  Thank you Judge, I'm terribly

3    sorry.

4          THE COURT:  Are you all right?

5          MS. DMITROVSKY:  I'm fine.

6          And, Judge, I did bring this just because although I

7    mentioned it, I think that this helps to answer your question

8    some.

9          Now, the Jose Vargas case, which is out of New York,

10   and you may have read it because he was the Post reporter who

11   wrote my life as an undocumented immigrant.  He wrote that for

12   the New York Times Magazine.

13         Now his case is a little bit different, in that it

14   did involve fake passports.  I don't believe he went outside

15   the country.  I re-read this last night.

16         But he did live in this country from the age of

17   twelve to I think 50, under an assumed name with fake

18   documents.

19         The other thing that is different is that unlike

20   having someone apply for a passport, as Mr. Alvarez did in

21   this case, Mr. Vargas decided to out himself really as-- I

22   mean he also happens to be gay, he talks about the dream act.

23         The thing is, he got so tired of looking over his

24   shoulder, that he said, and he had-- he had all kinds of fake

25   driver's license and things.  That the more he achieved the

- S E N T E N C E -                    59

1    more scared and depressed he became.

2              And that he was finished running, he was exhausted.

3    He didn't want that life any more, a mix of humiliation and

4    liberation.

5              The point I bring this up is that he has not been

6    charged with anything yet in the Second District in New York

7    where he lives.

8              I don't-- as far as I know, from what I read lately

9    about it, Department of Homeland hasn't done anything.  I

10   think they are in a quandary as to what to do with somebody,

11   who is a Pulitzer Prize winner, who outs himself and Mr.

12   Holder at the Department of Justice, they really don't know

13   what they are going to do.  I think he would have been charged

14   by now, if they were going to do that.  I mean I can't say.

15             But I think that that case is like this, in that

16   this is a guy who educated himself here, who went on to get a

17   master's, who became a well known and a very good journalist,

18   works for major newspapers, with the false identification.

19             But, Government sees it as something else.  Because

20   I mean, granted it is a God given talent that he happens to be

21   that good of a journalist and he works hard to do this.  This

22   isn't the average Joe who is trying to do that and the fact

23   that the Government hasn't done anything with it yet,

24   including deport him, tells me and I think others, that in a

25   case like this, in a case like this, where you have this kind

- S E N T E N C E -                    60

1  of situation, that although you do have to deter people from

2  doing this, there are as they say in 3553, the nature and the

3  circumstances of the offense.

4          And the history and the characteristics of the

5  defendant and that is why I ask for a variance on that.

6  Because I think this is a lot like the Jose Vargas case.  I

7  can pass it up to you if you want to see it.

8          THE COURT:  Yes, I am aware of it.

9          MS. DMITROVSKY:  You are aware of that case.

10         THE COURT:  Yes.

11         MS. DMITROVSKY:  I know there are cases down here

12 that I pointed out to Ms. Mitrani, the Elijah Darkins case

13 correct given pretrial diversion, but I agree with Ms. Mitrani

14 that was different.  He was lied to by his parents.  He was

15 told that he was a U.S. citizen.  He served in Afghanistan.

16 Of course you are going to give him that kind of thing.

17         But, with Jose Vargas, I think it parallels this

18 case, and it says, as the Government seems to be saying, that

19 that makes it different.  There is something different about

20 that.  He deliberately did those documents as well.

21         I mean he didn't-- he had a passport, I don't

22 believe he traveled on it, but he used it for identification

23 and things.  And so, I can't say any more about that except

24 that that is where I see really where the change is, in other

25 people's cases.

- S E N T E N C E -                         61

1          THE COURT:  Thank you.

2          I appreciate your thoughts and analysis of that.

3          MS. DMITROVSKY:  Thank you.

4          THE COURT:  Let me turn if I might to Ms. Mitrani to

5    get the benefit of the Government's assessment of this case.

6          MS. MITRANI:  Thank you Your Honor, there is a lot

7    that can be said.  A lot has already been said.

8          Let me point some things out.  I guess one thing

9    that sort of struck me and I know the Court is aware, I think

10   Mr. Silver and some other people made the statement that this

11   was a victimless crime.

12         Needless to say, this was not a victimless crime.

13   There is a real Jose Luis Alvarez who lives in New York, with

14   a Social Security number, with a date of birth, and he is a

15   victim in this case.  In fact when he went to apply for a

16   passport, the authorities thought he was the one who was

17   committing identity theft.  This poor man for awhile, and it

18   wasn't along while but for awhile was a suspect.

19         He has also suffered other collateral effects of the

20   defendant using his Social Security number in terms of credit

21   lines and what have you.

22         So, you know, I wanted to dispel any notion to the

23   Court or to the public, to anybody that this was a victimless

24   crime.  It wasn't.  There is a victim here.

25         Now, having said that, Your Honor, I know Your Honor

- S E N T E N C E -                    62

1    made the point about that this is an aggravated identity theft

2    case.  Indeed it is.  In the indictment, it was a two count

3    indictment.  However, we agreed to drop the aggravated

4    identity theft count, as part of the plea that was reached in

5    this case.  I will tell the Court why.

6              We don't charge--

7              THE COURT:  You don't have to do that.  I simply--

8    obviously my obligation is to analyze what is taking place

9    here.  I am simply pointing out in looking at the crime that

10   is committed and the Government has accepted a plea to

11   passport fraud, but the circumstances of this, obviously,

12   suggest that it could have been much more serious.

13             So the Government made some judgement calls about

14   how the Government was willing to dispose of the case.  As you

15   have pointed out there is a human being, turns out, frankly it

16   would not make a difference whether he were alive or dead.  He

17   happens to be alive.  And, I guess that is what brought this

18   all to the floor when he went, applied for a passport and had

19   been told that his passport had been issued a couple of times

20   before then.

21             But, what is the Government's assessment here?  I

22   mean, I take it you to, agree with much of what has been said

23   here today.  That while in the United States, from being a

24   very young man through now the last thirty some odd years, Mr.

25   Pena has done some really lovely things and acted as a law

- S E N T E N C E -                    63

1    abiding person and so on.

2          What is the Government's views as to what is the

3    proper way to handle this type of a case?

4          MS. MITRANI:  I will say-- yes, I agree with that.

5    Although again there are issues with him having assumed this

6    identity in terms of having made income.  Issues with the IRS,

7    I won't address that.  He seems to be, in the sense an

8    outstanding citizen.  Of course he is not a citizen.  Quite

9    the opposite.  He has no legal status.

10          In terms of our assessment, is the Court asking in

11    terms of what an appropriate sentence would be.

12          THE COURT:  I am interested in what is the

13    Government's assessment of the case.  I mean here is a man who

14    on at least three occasions, has applied for a passport and

15    has provided false information.  We know that is a crime.  It

16    turns out that in the course of providing the false

17    information, he used another person's name.  He thought the

18    gentleman was dead, the man is not dead.

19          You have alluded to the fact also that while in the

20    United States, there may well be income tax issues that he--

21    it just shows, how difficult one thing becomes on the other.

22    They compound each other.  But, what is the Government's view

23    as to what is the appropriate resolution in a case like this.

24          MS. MITRANI:  Yes, Your Honor, I will try to address

25    that head on.

- S E N T E N C E -                    64

1        The Government's view is as follows:

2        The passport fraud is a serious crime.  I think the

3   Court pointed that out.  It always has been and particularly

4   in this post 9/11 world.  I think a passport is one of the

5   last remaining sort of gold standard type documents that is

6   not as easily forged as other ones.

7        Although there are cases of forgery, I'm not

8   suggesting otherwise.  Which are particularly protective of

9   that and that is why it is a federal crime.

10       On the other hand, Your Honor, I will say although

11  there are issues with Mr. Pena having used the real victim's

12  identity and financial-- it is not a case where the Court and

13  Government -- obviously we've seen people commit identity

14  theft not only do they take identity to get a passport but

15  lines of credit, credit cards.  Go on shopping sprees, and not

16  pay them.

17       THE COURT:  There is a man coming in today, when the

18  police went to his home, he had twelve hundred Social Security

19  numbers and all those kinds of things.  So we do know that

20  exist.

21       MS. MITRANI:  Right.

22       So, this case is in a different category, because he

23  didn't take the identity and the identifying information to

24  commit financial crimes.  I think that is what places this

25  case in a different category from the standpoint of the plea

- S E N T E N C E -                      65

1   agreement that we reached.  The thinking behind it and in

2   terms of our recommendation.

3            Your Honor, I know Your Honor has read the PSI and

4   the Court has different sentencing options.  One sentencing

5   option is a sentence of imprisonment that includes a term of

6   supervised release, a condition that substitutes community

7   confinement, home detention provided one month is satisfied by

8   in prison.

9            In our view the defendant has spent, I think at

10  least a month perhaps more in prison.  Our recommendation

11  would be for him to receive a sentence of imprisonment to time

12  served, in addition to six months of home confinement.

13           I think-- I would not call that a lenient sentence,

14  I would call it a generous sentence, and I think it accounts

15  for the good works that he has done in the fact that he hasn't

16  committed financial crimes with the stolen identity.

17           He has caused collateral effects and that will have

18  to be dealt with.  Sort of that is our thinking.

19           THE COURT:  Then, where-- what does the Government

20  see happening after that?  That Mr. Pena is going to be

21  deported from the United States?

22           MS. MITRANI:  Well, Your Honor, as the Court knows,

23  that is a different issue for a different Court.  In other

24  words, there is going to be a different agency, what was

25  formally known as Immigration, is going to have to -- is going

- S E N T E N C E -                    66

1   to prosecute that the way they see fit.

2           And, an Immigration -- what is formally known as

3   Immigration Judge, some kind of administrative judge will make

4   a determination.

5           It is not the United States Attorney's position to

6   take any position on that.  In other words, we are not

7   involved.  That will be a collateral consequence, he will have

8   to face.

9           I am told, I don't know, I'm told that he has a--

10  actually I met an immigration attorney that is representing

11  him.  So I can't say that.  I am told that he is going to make

12  an effort to try to remain here whether by asylum, because of

13  his sexual orientation, because of a special skill.  Whether

14  he will be successful or not, I don't know.  That is sort of

15  part of our thinking too, in terms of the plea he may have a

16  collateral consequence of being deported.

17          I take, I, being I the Government, the U.S.

18  Attorney's office of the Southern District of Florida, the

19  Department of Justice, we take no position on that matter.

20          THE COURT:  Obviously something you do take into

21  consideration, very carefully, is this issue of deterring Mr.

22  Pena, and then general deterrence.

23          Is it your view with respect to the issue of general

24  deterrence, that the facts of this case, are so unique that is

25  what led Mr. Pena initially to take this action and then

```
                    - S E N T E N C E -                    67
```

1  continue it, that would justify the sentence that you are

2  recommending?

3        MS. MITRANI:  Your Honor, I can say in other cases

4  where we have seen people come in and assume somebody else's

5  identity, they want to be reunited with a child, but not

6  commit other financial crimes or other crimes, I have seen

7  similar sentences.

8        So I think--

9        THE COURT:  I have to tell you, I'm bothered by

10  this.  Because what I see with some regularity, are people

11  desperately trying to come back into the United States, having

12  been deported once, and the reason they are trying to come

13  back is that they lived here for a long time, before they were

14  deported and they have formed relationships, many times they

15  have had families, and so on.  And they are seeking to reunite

16  with those folks in the United States.  And they are caught at

17  the airport or they are caught on a beach someplace and in my

18  experience the Government uniformly prosecutes those people

19  and seeks jail time and of course, re-deportation.  That is

20  what I am struggling with.

21        We obviously want to have some rational basis and

22  sense of uniformity that we are applying across the board

23  here.

24        This case is not just someone coming into the

25  country, but is someone having come in and now repeatedly and

- S E N T E N C E -                    68

1   fraudulently having obtained false passports.  I think an

2   argument would be made that that is frankly more serious.

3          MS. MITRANI:  I agree.  I agree with the Court.

4          I will say two things.  One, I think the Court said

5   it before, this case is somewhat unique because of the

6   circumstances.

7          Second, I think a lot of these, what we call reentry

8   cases are people who have been removed because they have

9   committed some deportable offense.  So not only do you have

10  the passport fraud.

11         THE COURT:  You are right about that.  Many times

12  that is the case.

13         MS. MITRANI:  We do take those very seriously

14  because if you don't, then frankly the flood gates in a sense

15  are already opened.  I can't imagine.

16         So I think fortunately for this defendant that is

17  not this case.  Now, if he were to be removed from the United

18  States, and if he were to come back because of his, you know,

19  very strong ties to Mr. Randi and the community, our position

20  would be very different.

21         Now, he is really knowingly and willfully and just

22  in a sense thumbing his nose at the law of the United States.

23  We would be in a different posture if God forbid if he was

24  before this Court or any other Court again.

25         THE COURT:  In this case the Government recommends a

                    - S E N T E N C E -                    69

1    sentence of time served to satisfy the confinement

2    requirement, period of home confinement.

3              MS. MITRANI:  Yes, sir.

4              THE COURT:  To be followed by supervised released.

5              MS. MITRANI:  Yes, sir.

6              And but, again, in terms of any kind of immigration

7    consequences that is to be taken up with--

8              THE COURT:  Separately.

9              MS. MITRANI:  A separate proceeding.

10             THE COURT:  All right.

11             Anything else that you want to say?

12             MS. MITRANI:  No, Your Honor, I think the Court--

13             THE COURT:  I need a moment to talk with the

14   probation officer.

15             (Whereupon, an off the record conversation was

16   held.)

17             MS. DMITROVSKY:  Judge, if I may add two things,

18   that I think you have some concern about.

19             THE COURT:  I think we are all set, thank you.

20             MS. DMITROVSKY:  Okay.

21             THE COURT:  We began today, and I know sometime it

22   seems somewhat mechanistic, but we began looking at the

23   sentencing guidelines.

24             The guidelines are very important because they do

25   seek to provide a norm, and it is not acceptable in a sense

- S E N T E N C E -                    70

1   that there be these extraordinary deviations from a norm,

2   unless they are truly justified.

3            So the guidelines in a sense help us establish the

4   norm, but sentencing has to be individualized, when all is

5   said and done for it to be a fair sentence, you really have to

6   look at, the facts and circumstances of each particular case.

7            Now, it is because of that, because these guidelines

8   today are advisory, there was a time when they were not, and I

9   think that most people are very pleased that they are advisory

10  because they are there to be considered.  But having been

11  considered, the Court is now obligated to turn to another

12  statute, title 18 of the U.S.C.  section 3553(a) where

13  Congress has set out a series of factors that need to be

14  considered.

15           And the first is the nature and the circumstances of

16  the offense.  And I'm concerned about this, because it is

17  easy, I think to lose sight of that, and this is obviously a

18  very important component.

19           What happened in this case, is that Mr. Pena as a

20  young man in 1982, or in the early 80's, applied for a

21  passport, using the name of a person that he believed to have

22  been dead, to have been deceased.  In other words, knowing

23  that it was a real Social Security number and a real name, and

24  he applied for that passport and then did this, subsequently.

25  That is repeated it.

- S E N T E N C E -                    71

1      He completed this application on three separate

2  occasions, using the identity of a gentleman by the name of

3  Jose Luis Alvarez, using his correct Social Security number

4  and his date of birth.

5      And, because of that, obviously, he was allowed to

6  live in the United States.  And he developed a life for

7  himself and when you think about it, we have talked a lot

8  about that life today, and that life is one in which he can

9  take very justifiable pride, and indeed, his friends and

10  supporters in the community, point to it as a life of

11  extraordinary accomplishment.

12      Accomplishment in the art community, in the arts,

13  accomplishment as just a human being, a very full human being,

14  a caring and loving human being.

15      The problem that I have as a Judge is, you know we

16  are a little bit schizophrenic about this whole issue of

17  immigration in our country.  We are a country of immigrants

18  and there is not a person here in this courtroom today, who

19  either themselves or a parent or perhaps a grandparent or

20  great grandparent came and brought us here.

21      Mr. Randi's point that this is an accidental thing.

22  We are the beneficiaries that somebody else underwent, that

23  extraordinary event of leaving family or friends behind and

24  coming to the United States in hope of a better life.

25      Now, I want to tell you, every day in the courtroom,

- S E N T E N C E -                    72

1   I see people who make efforts to come to the United States.

2   We have this wet foot dry foot policy, because we recognize

3   that people fleeing from Cuba, are entitled to special

4   protections.  And we see people going through extraordinary

5   deprivation coming to the United States, hoping to get their

6   foot on dry land so that they can take some of the benefits

7   here.

8           I see people desperate to come to the United States,

9   and telling the captain of a boat that they can't swim and

10  will they be let off at a dock, oh, yes, you will.  Will the

11  passage be safe.  Oh, of course it will.  Will I have room to

12  sit on the boat.  Oh, yes, you will.

13          Only to have people coming over here in boats that

14  are incredibly unsafe, to have a man be told that you don't

15  want to carry a suitcase because if you carry a suitcase and

16  you are seen walking down the street, they will know you just

17  got off the boat.  And so what does he do?  He puts on three

18  pairs of clothing one over the other and then when the captain

19  panics and tells them to jump off, he sinks like an anchor and

20  dies of drowning.

21          Or the mother just last week, pregnant with a child

22  and goes underneath the boat when it capsizes and we see this

23  time and time again.

24          And so, we look at this, because we see people who

25  are desperate to come to the United States, sometimes just to

- S E N T E N C E -                    73

1  improve their lives, and I don't mean just in a negative way,

2  they want to improve their lives.

3          We see people who come to the United States and Ms.

4  Mitrani was talking about this, they have lived in the United

5  States, and their whole lives have been in the United States,

6  and then they have done something and they got deported for

7  it.  Sometimes it is a drug crime, sometimes it is something

8  else.  And yet they get back to some country, there is nobody

9  there, sometimes they don't even speak the language to the

10 country that they are deported to.

11         And their children and wives are in the United

12 States, and there is this incredible compulsion to come back

13 and join their family.

14         And, you know, Mr. Pena's situation, he has

15 described it eloquently and his desire to seek a peaceful

16 life, so he comes to the United States.  I simply say to you

17 from a Judge's point of view it is so difficult to evaluate

18 these cases, and to try to have a norm that makes sense.

19         Because, all of us understand people's desires to

20 come into the United States.  If anyone has ever been at a

21 naturalization ceremony as Mr. Randi suggested, the joy of

22 those people and the gift that they are making to the United

23 States of themselves, is remarkable.

24         But you know, since 9/11, if it wasn't true before

25 then, it certainly was, we realize every country has to have

- S E N T E N C E -                    74

1   an ordered immigration policy, and we also know today that

2   every country has to be on guard that there are people out

3   there who frankly want to do harm to the United States.

4           So being able to guard your borders, being able to

5   have passport controls that are meaningful, is terribly

6   important.  It is terribly important.

7           We live in a world, we see it at night on television

8   and so on, and we know that there is a level of hatred and

9   malevolence that is real that would like to do harm.

10          So, this is a serious crime and we can't under

11  estimate the nature of the crime.  I think frankly this

12  morning, we for all reasons that you understand, we have been

13  looking at what is the second factor and that is, the history

14  and the characteristics of the defendant.

15          I wanted to come back to one other aspect of the

16  crime itself.  The Government for all reasons and good

17  reasons, and certainly quite magnanimous and I think because

18  of the facts of this particular case, elected not to insist on

19  a plea to a charge of aggravated identity theft, that carries

20  a mandatory minimum sentence.  Because of the recognition of

21  the harm that is done and certainly, there again, there are

22  all types and variances of crimes of identity theft set to

23  come into court this afternoon.  As I mentioned is a gentleman

24  who when he was arrested, has twelve hundred Social Security

25  numbers and other things. Clearly he is up to no good with

- S E N T E N C E -                    75

1    something like that.

2            But, this concept of identity theft is a more recent

3    phenomenon and I think again, we all heard of the people who

4    tell you what a difficult crime that is.  I'm talking now

5    about the victims, of trying to clear things up.  Of how

6    difficult it is when you get into credit ratings and all that

7    type of things.

8            Now, the Court is obligated also to look at the

9    history and the characteristics of the defendant.  And,

10   everything that has been said here today, I take as the gold

11   standard.  I don't have any doubt that everything that has

12   been said is true and accurate.

13           But for the commissions of these crimes, Mr. Pena

14   has led an exemplary life.  He is obviously someone who can

15   take just pride in what he has done and what he has

16   contributed to his family and to the community.

17           Now, the Court's obligation today is to impose a

18   sentence number one that reflects the seriousness of this

19   crime, that would promote respect for the law.

20           You know the obligation to impose a sentence is the

21   Court's responsibility, but I certainly look and take into

22   account, the recommendations that are made to me, particularly

23   recommendations that are joined in, by the Government.  And

24   the Government's recommendations today, are significant and

25   certainly generous.

- S E N T E N C E -                          76

1         The difficulty that I have tried to factor is, a

2    sentence that would be a deterrent.  Well, a deterrent to Mr.

3    Pena, I suspect Mr. Pena tomorrow would do exactly what he did

4    today, because I suspect he wants very much to be in the

5    United States, and to continue to be in the United States.

6         Obviously, he has been arrested and caught and his

7    resolution of that issue is going to have to remain in the--

8    with the Immigration court.

9         But, I suspect that that is going to be a difficult

10   issue that he is going to have to deal with and that he knows.

11        But candidly what I have been wrestling with is, my

12   obligation to impose a sentence that will be a general

13   deterrent.  I mean I have to be concerned about number one,

14   the message that goes out from this courtroom.  I think you

15   understand, I think there are lots of people, who would like

16   to stay in the United States and who if they knew that the

17   result of this is a month in jail, and home confinement, would

18   not blink an eye lash before they send in the next application

19   to the passport office.

20        I am concerned about the Court treating people

21   across the board fairly and I must tell you, I'm not sure I

22   understand the distinctions or agree quite with the

23   distinctions of someone who says, well, I came back because I

24   wanted to be with my family, as opposed to someone who says, I

25   came back because I wanted to escape persecution. They are

- S E N T E N C E -                    77

1    both there, they are both real, they both impel people to do

2    things.

3             Having said all of that, I must tell you, I do tend

4    to agree that the circumstances of this Court-- of this case

5    are quite unique.

6             I want to be very candid with you, I came in here

7    today, prepared to impose a sentence of 24 months in the

8    Bureau of Prisons.  I didn't think that the guidelines

9    actually in this case, served as an adequate deterrent.  But,

10   I have listened to a great deal today, I have listened to the

11   Government's assessment, I have listened to the assessment by

12   family and friends and I want to tell you, I am prepared to

13   change that sentence.

14            Now, one other aspect that the Court is obligated to

15   do is to make a determination whether a monetary fine should

16   be imposed.  I have looked at the sales figures from some of

17   Mr. Pena's paintings.  Nonetheless, I am satisfied that he

18   does not have the ability to pay a monetary fine, and for that

19   reason, no monetary fine is going to be imposed.

20            Accordingly, it is the judgment of this Court, that

21   the Defendant Deyvi Pena, is to be sentenced to the United

22   States Bureau of Prisons to be sentenced for a term of time

23   served as to count one.

24            He is then going the be placed on supervised

25   release.  Let me double check this for a minute.

- S E N T E N C E -                    78

1          (Pause.)

2              What is the period of supervised release in this

3     case, is it not more than three?

4              PROBATION OFFICER:  One to three years.

5              THE COURT:  I'm going to impose a period of three

6     years of supervised release, with the following special terms

7     and conditions.

8              Because the guideline range is zone B, one of the

9     terms and conditions is that Mr. Pena will be on home

10    confinement for a period of six months.  The period of home

11    confinement is going to be monitored by the Probation office

12    with the normal electronic monitoring process.

13             While on supervised release, and if Mr. Pena is

14    allowed to remain in the United States, he must maintain full

15    time legitimate employment, not be unemployed for longer than

16    thirty days, without the written permission of the Court, and

17    he must provide all documentation requested by the probation

18    officer to verify that employment, but in this case, I do not

19    limit self employment.  In other words, his employment as an

20    artist will fulfill his employment.

21             While on supervised release he must submit to a

22    search of his person, his property and his home, that search

23    to be conducted in a reasonable manner and done at a

24    reasonable time by the probation officer.

25             Also as a special condition of supervised release,

- S E N T E N C E -                    79

1    upon request by the Immigration authorities, Mr. Pena is to

2    surrender himself to the custody of the United States Customs

3    and Immigration Authorities for removal or deportation

4    proceedings, consistent with the Immigration and Nationality

5    Act.

6                Mr. Pena, if you are in fact removed or deported

7    from the United States, please remember that you must not

8    re-enter the United States, without first obtaining the

9    written permission of the governmental official called the

10   Secretary for Homeland Security.

11               If in fact you are deported from the United States,

12   within that term of supervised release, the term of supervised

13   release becomes non reporting.

14               Mr. Pena, please understand that if someone is

15   deported from the United States, and comes back into the

16   United States without obtaining the appropriate authority that

17   becomes a very very serious offense.

18               I want to be very clear in this regard, the Court

19   has taken no position whatever, with respect to deportation or

20   removal.  But what I have simply indicated is, that I want the

21   Probation office to notify the Department-- of the U.S.

22   Customs and Immigration Services of Mr. Pena's being placed on

23   supervised release, and if requested by them, he is to

24   surrender himself to their custody.

25               Also, while on supervised release, Mr. Pena, shall

- S E N T E N C E -                    80

1   perform 150 hours of community service, that shall be

2   completed no later than three months prior to the termination

3   of his supervision.  This community service may well consist

4   of the utilization of his artistic ability to perform some

5   type of community service that would be appropriate and would

6   benefit the community.

7           In terms of the home detention and electronic

8   monitoring, Mr. Pena, shall participate in that home detention

9   electronic monitoring period as I said, for a period of six

10  months.

11          During that period of time, he shall remain at his

12  place of residence, except for employment and other activities

13  approved in advance by the probation officer and he shall

14  provide the probation officer with requested documentation.

15          In order to facilitate this, he must maintain a

16  telephone at his place of residence, without call forwarding,

17  call waiting, a modem, caller ID or a call back, call block

18  service for that period of time.

19          He must also wear an electronic monitoring device,

20  and follow the electronic monitoring procedures as instructed

21  by the probation officer.

22          He is to pay for the electronic monitoring equipment

23  at the prevailing rate in accordance with his ability to pay.

24          Finally, Mr. Pena, you must submit or pay to the

25  United States a special assessment in the sum of $100.

- S E N T E N C E -                    81

1           Mr. Pena, it is my obligation to tell you, that you

2     are entitled to take an appeal from the judgment and sentence

3     that have been announced here today.  I want you to know that

4     if you would like to take an appeal and if you yourself do not

5     have the money to hire counsel to represent you on appeal,

6     please know that I would in fact appoint a lawyer to represent

7     you.

8               In order to take an appeal, you have to file a piece

9     of paper that is called a Notice of Appeal, and that notice

10    must be filed within 14 days of the date when the judgment and

11    sentence are entered on the books of the Court.

12              Now, before I conclude today, it is my obligation to

13    elicit from counsel for both parties, their fully articulated

14    objections to the Court's findings of fact, and conclusions of

15    law.

16              Also, to elicit any objections that either party

17    might have to the manner in which the sentence has been

18    imposed.

19              Let me turn first if I might to counsel for the

20    Government.

21              MS. MITRANI:  No objections, Your Honor.

22              THE COURT:  Let me come now to counsel for the

23    defense.

24              MS. DMITROVSKY:  No objections, Your Honor.

25              THE COURT:  Anything else then to come before the

```
                        - S E N T E N C E -                      82

 1    Court?

 2              MS. DMITROVSKY:  No, thank you.

 3              THE COURT:  Thank you all very much.  Thank you all

 4    for coming.

 5              (Whereupon the matter concluded.)

 6

 7              - - o o O o o - -

 8

 9

10

11    CERTIFIED to be a true
      and accurate transcript
12    ONLY if an or ORIGINAL
      or signed copy.
13
      S/Richard W. Barry
14    _____
      Richard W. Barry, RPR
15

16

17

18

19

20

21

22

23

24

25
```

RB        OCR